CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED
OCT 07 2021
JULIA C. DUDLEY, CLERK
BY: s/ H. MCDONALD
    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | |
|---|---|
| DAIRY ENERGY, INC., | ) |
| Plaintiff, | ) Civil Action No. 4:20cv00068 |
| v. | ) **MEMORANDUM OPINION** |
| THE HARTFORD STEAM BOILER INSPECTION AND INSURANCE COMPANY, | ) By:   Hon. Thomas T. Cullen<br>)        United States District Judge |
| Defendant. | ) |

Plaintiff Dairy Energy ("Dairy Energy") previously operated a facility that converted animal waste into energy. To accomplish this, Dairy Energy installed an anaerobic digester that processed animal waste into methane gas, which was used to power a generator and produce electricity ("the Digester"). To protect this investment, Dairy Energy took out an insurance policy to cover equipment breakdown ("the Policy") from Defendant Hartford Steam Boiler Inspection and Insurance Company ("HSB"). In November 2017, Dairy Energy discovered that the roof of the Digester had broken away from the rest of the vessel, causing it to collapse into the waste. Dairy Energy timely filed an insurance claim with HSB, which HSB denied.

As a result, Dairy Energy filed a complaint against HSB in Virginia Circuit Court alleging a breach of the insurance agreement, which HSB later removed to this court based on diversity jurisdiction. This matter is now before the court on the parties' cross motions for summary judgment. Because the court finds that the Digester falls under an exclusion to

"Covered Equipment" and therefore does not qualify for insurance coverage, HSB's denial of Dairy Energy's claim was proper, and the court will enter summary judgment in favor of HSB.

## I.     BACKGROUND

In 2011, Dairy Energy began operating the Digester as part of a system for generating electrical power at the Van Der Hyde Dairy Farm in Chatham, Virginia. (Dep. of Roy Van Der Hyde 10:16–21, July 20, 2021 [hereinafter "VDH Dep."] [ECF No. 36].)[1] Van Der Hyde Dairy and Dairy Energy are both owned and operated by the Van Der Hyde family. Roy Van Der Hyde is the Vice President of Dairy Energy, and he oversaw the Digetser's daily operation.

The Digester is a 16-foot-tall rectangular vessel, 14 feet of which sit underground and 2 feet of which are above ground. (*Id.* at 13:9–22.) The Digester is made of concrete, reinforced by rebar, and the underground portion is encased in sheet foam. (*Id.* at 18:18–19:4; Decl. of Travis D. Wells ¶ 6, Aug. 20, 2021 [ECF No. 19-3].) The portion that sits above ground is encased in spray foam that cannot be removed. (Dep. of Deleon Lutz 71:18–19, July 16, 2021 [ECF No. 37][2]; VDH Dep. at 19:1–4.) The Digester does not feature access hatches or ports that allow for inspection. (Wells Decl. ¶ 6.) A design image of the Digester system is included for reference:[3]

---

[1] The parties included portions of the deposition transcript of Roy Van Der Hyde in their briefing on these cross-motions for summary judgment. The court requested the full transcript, which is part of the court's record. (*See* ECF No. 36.)

[2] The parties also included portions of the deposition transcript of Deleon Lutz in their briefing. The court requested the full transcript of this deposition, which is now part of the court's record. (*See* ECF No. 37.)

[3] The arrow labeled "U-Shaped Concrete Tank" indicates the Digester.



(*Id.* at 15–16.)

While in operation, the Digester holds cow manure. (Lutz Dep. at 96:15–19.) The concrete, foam, and surrounding earth ensure the Digester maintains a consistent temperature that allows the manure, and bacteria within it, to interact and produce methane gas. (*Id.* at 89:18–22.) This methane gas creates a small amount of pressure inside the Digester. (*Id.* at 96:15–19.) The Digester is designed to function under pressure between one and four inches of "water column," a unit of measurement for very low amounts of pressure. (*Id.* at 41:3–42:18.) The pressure in the tank arises from the methane gas produced during this biological process. If the pressure in the tank exceeds four inches of water column, a pressure-relief valve opens to expel some of the gas. (*Id.* at 39:7–16.) A second valve opens whenever the pressure exceeds 6 inches of water column. (*Id.*) When the tank is operating normally, the methane produced is channeled into a generator, which burns the gas to produce energy. (*Id.* at 49:14–50:16.)

On November 20, 2017, Van Der Hyde noticed that the generator was no longer receiving gas or producing energy. (VDH Dep. at 14:18–15:11.) After investigating further, he discovered that one section of the Digester's roof had "collapsed." (*Id.*) Dairy Energy enlisted the help of a company that routinely installs and repairs similar Digesters; the company, in

turn, dispatched Deleon Lutz to investigate the cause of the collapse and estimate the cost of repair. (Lutz Dep. at 21:1–22.) Lutz concluded that a buildup of sulfuric acid created a "caustic environment" that "ate away at the roof planks until their structural integrity was compromised to the point of the [D]igester cover breaking apart." (ECF No. 16-2, at 2.) During his investigation, Lutz took several pictures of the damage to the roof depicting cracks in the concrete, splitting of the roof from the walls, and the collapse of the roof. (*Id.* at 4–5.)





Lutz estimated that repairs would cost $735,000. (*Id.* at 2.)

At the time Van Der Hyde discovered the collapse, Dairy Energy owned an equipment insurance policy through HSB. (ECF No. 1-2, at 8–9.) Following the collapse of the Digester roof, Dairy Energy timely filed a claim with HSB, which HSB ultimately denied. (*Id.* at 67–70.) Dairy Energy filed a complaint against HSB on November 1, 2019, in the Circuit Court of

Pittsylvania County, asserting what the court construes as a single count of breach of contract. On November 12, 2020, HSB filed a notice of removal in this court. This matter now comes before the court on the parties' cross motions for summary judgment.[4]

For the reasons that follow, the court finds that the Digester falls under a coverage exclusion in the Policy. Accordingly, the court will enter summary judgment in favor of HSB.

## II. STANDARD OF REVIEW

Under Rule 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties. *Celotex*, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* (citation omitted). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party meets that burden, the nonmoving party must then come

---

[4] As a threshold matter, HSB argues that Dairy Energy's motion for summary judgment suffers from a procedural deficiency because "it does not contain a separately captioned section setting forth undisputed material facts" and supporting record citations. (ECF No. 29, at 2.) The court, however, finds no such defect. While Dairy Energy's brief in support of its motion for summary judgment (ECF No. 17) does not contain a separately captioned section enumerating the undisputed material facts in this case, its motion for summary judgment (ECF No. 16) contains that list and sufficiently complies with the requirements of the Federal Rules of Civil Procedure and this court's Local Rules.

forward and establish the specific material facts in dispute to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *Glynn*, 710 F.3d at 213 (citing *Bonds v. Leavitt*, 629 F.3d 369, 380 (4th Cir. 2011)). Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014) (internal alteration omitted) (quoting *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (per curiam)). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. The nonmoving party must, however, "set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" *Glynn*, 710 F.3d at 213 (quoting *Anderson*, 477 U.S. at 252). The nonmoving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. "In other words, to grant summary judgment the [c]ourt must determine that no reasonable jury could find for the nonmoving party on the evidence before it." *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990) (citing *Anderson*, 477 U.S. at 248). Even when facts are not in dispute, the court cannot grant summary judgment unless there is "no genuine issue as to the inferences to be drawn from" those facts. *World-Wide Rights Ltd. P'ship v. Combe, Inc.*, 955 F.2d 242, 244 (4th Cir. 1992).

When considering summary judgment regarding the interpretation of a contract, the court "faces a conceptually difficult task . . . ." *Id.* at 245. To satisfy summary judgment without

extrinsic evidence a writing must be unambiguous. *Id.* A writing is not unambiguous if "susceptible to two reasonable interpretations." *Am. Fid. & Cas. Co. v. London & Edinburgh Ins. Co.*, 354 F.2d 214, 216 (4th Cir. 1965). A court must first "determine whether, as a matter of law, the contract is ambiguous or unambiguous on its face." *World-Wide Rights Ltd. P'ship*, 955 F.2d at 245. If the contract is unambiguous on the dispositive issues, a court can interpret the contract as a matter of law and grant summary judgment. *See id.* On the other hand, if a court determines that the contract is ambiguous, it may still "examine evidence extrinsic to the contract that is included in the summary judgment materials" and grant summary judgment if that evidence proves dispositive. *Id.* If, however, extrinsic evidence still leaves genuine issues of fact regarding the contract's interpretation, "summary judgment must of course be refused and interpretation left to the trier of fact." *Id.*

### III.  ANALYSIS

**A. Choice of Law and Rules Governing Interpretation of Insurance Contract at Issue**

In this diversity action, the court must apply the substantive law and choice-of-law rules of the state in which it sits; in this case, Virginia. *See Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 623–24 (4th Cir. 1999) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97 (1941)). Virginia choice-of-law rules dictate that, in interpreting a contract, courts apply the law of the state where the contract was made. *See Lexie v. State Farm Mut. Auto. Ins. Co.*, 251 Va. 390, 394 (1996). Under Virginia law, "an insurance contract 'on or with respect to the ownership, maintenance or use of property in this Commonwealth shall be deemed to have been made in and shall be construed in accordance with the laws of this Commonwealth.'" *Factory Mut. Ins. Co. v. Liberty Mut. Ins. Co.*, 518 F.Supp.2d 803, 808–09

(W.D. Va. 2007) (quoting Va. Code Ann. § 38.2-313). The Policy at issue in this case covers equipment that is located in Virginia, so the court will apply Virginia law.[5]

"[A]n insurance policy is a contract to which the ordinary rules of contract interpretation apply." *State Farm Fire & Cas. Co. v. Wallace*, 997 F. Supp. 2d 439, 447 (W.D. Va. 2014) (citing *TravCo Ins. Co. v. Ward*, 736 S.E.2d 321, 325 (Va. 2012)). "Under Virginia law, if policy language is clear and unambiguous, [the court does] not apply rules of construction; rather, [it] give[s] the language its plain and ordinary meaning and enforce[s] the policy as written." *Seabulk Offshore, Ltd. v. Am. Home Assurance Co.*, 377 F.3d 408, 419 (4th Cir. 2004) (citing *P'ship Umbrella, Inc. v. Fed. Ins. Co.*, 260 Va. 123, 133 (2000)). "Conversely, when the policy language is ambiguous and the intentions of the parties cannot be ascertained, the policy must be construed strictly against the insurer and liberally in favor of the insured, so as to effect the dominant purpose of indemnity or payment to the insured." *Id.* (citing *St. Paul Fire & Marine Ins. Co. v. S.L. Nusbaum & Co.*, 227 Va. 407, 411 (1984)).

Policy "[l]anguage is ambiguous when it may be understood in more than one way or when such language refers to two or more things at the same time." *Salzi v. Va. Farm Bureau Mut. Ins. Co.*, 263 Va. 52, 55–56 (2002). "Similarly, reasonable exclusions to coverage, when stated in the policy in clear and unambiguous language that is clearly applicable to a specific situation at hand, will be enforced." *Horace Mann Ins. Co. v. Barney*, No. 2:17cv00016, 2018 WL 1733989, at *2 (W.D. Va. Apr. 10, 2018) (citing *Transcon. Ins. Co. v. RBMW, Inc.*, 262 Va. 502, 512 (2001)). "Where exclusionary provisions are ambiguous, they will be interpreted in a

---

[5] The parties appear to agree that Virginia law controls the Policy at issue.

manner that provides coverage to the insured." *Id.* (citing *Lower Chesapeake Assocs. v. Valley Forge Ins. Co.*, 260 Va. 77, 88 (2000)).

Whether an insurance policy is ambiguous is a question of law for the court to decide. *Wilson v. Holyfield*, 227 Va. 184, 187 (1984). A court should not find ambiguity "merely because the parties disagree as to the meaning of the language employed by them in expressing their agreement." *Id.* Similarly, a court "must not strain to find ambiguities" where there are none. *Admiral Ins. Co. v. G4S Youth Servs.*, 634 F. Supp. 2d 605, 612 (E.D. Va. 2009). In construing contractual provisions, "[n]o word or clause in the contract will be treated as meaningless if a reasonable meaning can be given to it, and [the court applies] a presumption that the parties have not used words needlessly." *Uniwest Constr., Inc. v. Amtech Elevator Servs., Inc.*, 280 Va. 428, 440 (2010); *see also Tate v. Tate's Ex'r*, 75 Va. 522, 527 (1881) ("In the interpretation of written contracts, every part of the writing must be made, if possible, to take effect, and every word of it must be made to operate in some shape or other."). A court should allow common sense as well as canons of construction to guide its interpretation of a provision. *See Mount Aldie, LLC v. Land Tr. of Va., Inc.*, 293 Va. 190, 200 (2017) ("Our presumption is always that the parties 'were trying to accomplish something rational. Common sense is as much a part of contract interpretation as is the dictionary or the arsenal of canons.'" (quoting *Fishman v. LaSalle Nat'l Bank*, 247 F.3d 300, 302 (1st Cir. 2001)).

Under Virginia law, the insured bears the burden to show that its loss is covered by the policy. *Md. Cas. Co. v. Cole*, 156 Va. 707, 716 (1931) ("The burden is upon the policyholder to bring [itself] within the terms of the policy."). In contrast, the *insurer* bears the burden to

establish that an exclusion applies to bar coverage. *See White v. State Farm Mut. Auto. Ins. Co.*, 208 Va. 394, 396 (1967).

**B.    Scope of Coverage**

Under the Policy, insurance coverage is only available for a "Covered Cause of Loss." (ECF No. 1-2, at 24.) The pertinent cause in this case is "'Accident' Only," and the policy makes clear that, "[w]ithout an 'accident,' there is no Equipment Breakdown Coverage." (*Id.*) The Policy defines "Accident" as

> a fortuitous event that causes direct physical damage to "covered equipment." The event must be one of the following:
> . . .
> (6) Bursting, cracking or splitting.
>
> b. None of the following is an "accident," however caused and without regard to whether such condition or event is normal and expected or unusual and unexpected. *However, if an event as defined . . . above results from any of the following, it will be considered an "accident."*
>
> (1) Depletion, deterioration, rust, corrosion, erosion, settling or wear and tear;
> (2) Any gradually developing condition . . . .

(*Id.* at 40 (emphasis added).) Integral to the definition of "accident" is a requirement that the event must cause physical damage to "covered equipment." The Policy defines "covered equipment" as "(a) [e]quipment that generates, transmits or utilizes energy . . . or (b) [e]quipment which, during normal usage, operates under vacuum or pressure, other than the weight of its contents." (*Id.* at 41.)

This coverage, of course, is subject to exclusions. Most pertinent to this case, "covered equipment" does not include "Buried vessels or piping." (*Id.*) The Policy defines "Buried vessels or piping" as "any piping or vessel buried or encased in the earth, concrete or other

-10-

material, whether above or below grade, or in an enclosure which does not allow access for inspection and repair." (*Id.* at 40.)

Dairy Energy contends that it is entitled to coverage because the November 20, 2017 incident was an accident that caused physical damage to the Digester, which is "Covered Equipment" under the policy and not subject to any exclusion. HSB argues that the Digester is not "Covered Equipment" under the Policy because it falls under the exclusion for "Buried vessels or piping."[6] HSB also argues that the Digester cannot qualify as "Covered Equipment" in the first instance because (1) it does not itself generate, transmit, or utilize energy; and (2) it does not operate under vacuum or pressure, other than the weight of its contents.

## C. Buried Vessel Exclusion Applies and Bars Coverage

The exclusion for "Buried vessels or piping" applies to the Digester in this case. Because that is a sufficient ground for resolving summary judgment, the court need not decide the threshold issues of whether the roof's collapse was a covered "accident" and whether the Digester would otherwise qualify as "covered equipment." The court assumes—without deciding—that both of these conditions are met.

As noted above, HSB bears the burden of establishing that an exclusion applies to bar coverage to Dairy Energy. *See White*, 208 Va. at 396. The Policy defines "Buried vessels or piping" as "any piping or vessel buried or encased in the earth, concrete or other material, whether above or below grade, or in an enclosure which does not allow access for inspection

---

[6] HSB argues, as an alternative to "Buried vessel or piping," that the Digester is a "Structure" because it is comprised of a "foundation, walls, and a roof." (ECF No. 19 at 14.) The Policy does not independently define "Structure." Because the court finds that the Digester falls into the Policy's definition of "Buried vessels or piping," the court need not determine whether another exclusion would apply.

and repair." (ECF No. 1-2, at 40.) HSB argues that 14 feet of the Digester sit below the ground, encased in the earth, and that the two feet that sit above ground are encased in spray foam. Dairy Energy does not contest the fact that 14 feet of the Digester are buried underground; rather, it contends that the spray foam does not "encase" the top two feet of the Digester. Dairy Energy argues that this spray foam constitutes an integral part of the Digester, and that the Digester cannot "encase" itself. And because nothing encases or buries the spray foam, Dairy Energy asks the court to find that the Digester is not a buried vessel.

Dairy Energy's argument is belied by the plain and unambiguous language of the exclusion and the undisputed facts about the composition of the Digester—as a whole. If a policy exclusion is clear and unambigous, the plain and ordinary meaning of its terms controls. *See Seabulk Offshore, Ltd*, 377 F.3d at 419. For equipment to fall under the Buried vessel or piping exclusion, it must first be either "piping" or a "vessel." Neither party contends that the Digester is piping. "Vessel" is not defined under the Policy either, but Merriam-Webster defines it as "a container (such as a cask, bottle, kettle, cup, or bowl) for holding something."[7] *Vessel*, Merriam-Webster, https://merriam-webster.com/dictionary/vessel (last visited Oct. 6, 2021). The undisputed facts show that the Digester holds manure and gas during normal operation and is specifically designed to keep these products contained in an airtight environment to produce energy. (*See* Lutz Dep. at 96:9–19; 71:18–19.) The term vessel plainly includes the Digester.

---

[7] Dairy Energy initially argued that the Digester roof or "cover" cannot be considered a "vessel" and advanced the idea that the roof was the only piece of "equipment" for which it sought insurance proceeds. (*See* ECF No. 17, at 5.) In its reply brief Dairy Energy seems to abandon this argument—perhaps realizing that the roof by itself would certainly not qualify under the Policy's general categories for "Covered Equipment"—and concedes that the entire Digester is the equipment at issue. (*See* ECF No. 30, at 2.)

The next clause of the buried vessel definition requires that the vessel must be "buried or encased in the earth, concrete or other material, whether above or below grade." (ECF No. 1-2, at 40.) The parties do not dispute that 14 feet of the Digester sit below grade[8], buried by the surrounding earth. (Lutz Dep. at 32:13–33:9.) In fact, Lutz testified that the surrounding earth serves an integral purpose of the Digester by providing structure. (*See id.* at 33:5–9 ("The digester is . . . not designed to free-stand above ground. The walls or the dirt provide structure.").) Lutz also testified that the earth insulates the part of the Digester that sits below grade, because the system needs to keep the manure at 100 degrees to continue producing energy. (*See id.* at 70:15–22.)

The buried vessel exclusion further provides that a vessel can also be buried or encased in "concrete or other material, whether above or below grade." (ECF No. 1-2, at 41.) So the exclusion plainly encompasses vessels that sit, in whole or in part, above the ground but are still encased by concrete or another material. The undiputed facts in this case establish that the two feet of the Digester that sit above grade are encased in spray foam, which covers all

---

[8] The plain and ordinary meanings of "below grade" and "above grade" are "below ground" and "above ground", respectively. Dairy Energy's expert, DeLeon Lutz, uses these terms interchangeably in his deposition:

> Q: And in your report, you describe the digester as an in-ground rectangular tank. What do you mean by "in-ground"?
>
> A: Many digesters are aboveground. This is 14 feet below grade.
>
> Q: So is it fair to say that it's just the top of it that is above grade?
>
> A: There's 2 feet of the wall that's above grade, and then the planks are put on top.

(Lutz Dep. at 32:13–21.)

of the walls and the roof. (VDH Dep. at 20:3–10.) The spray foam is permanent, cannot be removed, and prevents visual inspection. (*Id.*)

Dairy Energy argues that the spray foam does not "encase" the Digester because it "is an integral part of the Digester itself and serves the purpose of maintaining a constant temperature required for the Digester to function."[9] (ECF No. 27, at 2.) Dairy Energy bolsters this argument by pointing out that the spray foam is part of the original design plans for the Digester. But both of these things are also true of the earth that encases the lower 14 feet of the Digester. The surrounding earth provides insulation, just like the spray foam, and is therefore an integral part of the system and serves an important purpose. Similarly, the original design plans demonstrated that the Digester would be partially buried in the earth. Dairy Energy does not offer a unique purpose the spray foam serves for the top two feet that the earth does not provide for the bottom 14 feet.

To accept Dairy Energy's arguments, the court would also be required to find that the earth cannot bury or encase the Digester because it too provides insulation and is an integral part of the system. This, in turn, would require the court to hold that the substantial portion of this vessel that is clearly buried underground is not a "Buried vessel." But the undisputed facts about the Digester, logic, and common sense do not permit this conclusion. *See Mount Aldie, LLC*, 293 Va. at 200 (directing courts to apply common sense to conclude the parties intended something rational by the terms of their agreement).

---

[9] The record does not demonstrate that the spray foam serves any other integral purpose for the Digester. When asked if the spray foam served another purpose, such as keeping air out of the Digester, Lutz testified that it did not; the concrete served that function instead. (Lutz Dep. at 71:20–72:10.)

In making these arguments, Dairy Energy seems to ask the court to narrow the buried-vessel exlcusion to apply only to a vessel that is buried or encased in the earth, concrete or other material *that serves no integral function or purpose for the equipment itself.* The exclusion, however, is not so narrowly drawn, and the court will not read in a requirement that was not part of the parties' agreement. *See id.* (refusing to read requirements into a contract that were not included by the parties); *Trex Co. v. ExxonMobil Oil Corp.*, 234 F. Supp. 2d 572, 575 (E.D. Va. 2002) ("[C]ourts [are not] at liberty to rewrite the contractual language, even if the plain language of the contract produces what some may consider a harsh result."). The spray foam therefore encases the top of the Digester, just as the earth buries and encases the bottom. The court concludes that this reasoning is sufficient to hold that the Digester falls into the Policy's buried vessel exclusion.

But Dairy Energy's claim also fails under the exclusion's second clause. The definition for buried vessel includes a vessel or piping "in an enclosure which does not allow access for inspection or repair" ("the enclosure clause"). (ECF No. 1-2, at 40.) The enclosure clause operates independently of the "encased" clause, and the application of either is sufficient to trigger the exclusion. Contracts are presumed not to use superfluous terms, so this clause cannot be considered merely a repetition of the same ideas as the prior clause. *See Ames v. Am. Nat'l Bank*, 163 Va. 1, 39 (1934) ("No word or clause is to be treated as meaningless if any reasonable meaning consistent with the other parts of the contract can be given to it . . . . The presumption always is that the parties have not used words aimlessly and that no provision is merely a superfluity unless it is plainly merely a repetition."). And, under Virginia law, "[c]ourts construe words in a contract as a whole rather than in isolation, and attempt to give meaning

to all of a contract's terms." *ACA Fin. Guar. Corp. v. City of Buena Vista, Va.*, 298 F.Supp.3d 834, 850 (2018) (citing *Ott v. Monroe*, 282 Va. 403, 407 (Va. 2011)). Under this clause equipment can also be a "Buried vessel" if it is enclosed in a way that does not allow for inspection and repair.

It is undisputed that "[t]here are no access hatches or inspection ports on the [D]igester vessel." (Wells Decl. ¶ 6.) The Digester is an "airtight tank" and the whole vessel is "sealed up" between the earth, sheet foam, and spray foam. (Lutz Dep. at 71:18–19.) Van Der Hyde had no indication that the Digester roof was corroding until it caved in, knocking the generator out of commission. (VDH Dep. at 14:18–22; 15:1–11.) Dairy Energy has not produced any evidence that the inside of the Digester vessel could be inspected. Instead, all of the record evidence demonstrates that the function of the Digester would be undermined if such openings or access points existed.[10] So, even if the Digester was found to not be "buried or encased in the earth, concrete or other material," it would still fall under this exclusionary provision because it is in an enclosure that does not allow access for inspection or repair.

For these reasons, the court concludes that the Digester qualifies as a "Buried vessel" and, therefore, is excluded from the definition of "Covered Equipment" under the Policy. Because Dairy Energy is only entitled to insurance proceeds for accidents involving "Covered Equipment," HSB is not required to pay Dairy Energy for this incident under the Policy.

---

[10] At oral argument HSB pointed out that this is precisely the type of result the Policy aims to avoid with its "Buried vessel" exclusion. HSB does not intend to be liable to repair equipment that cannot be inspected.

-16-

## IV. CONCLUSION

The court finds that the Digester falls into the Policy's exclusion for "Buried Vessels or Piping." For these reasons, the court will grant summary judgment to HSB and deny Dairy Energy's motion for summary judgment. HSB's motion to exclude the expert testimony of Deleon Lutz will be denied as moot.

The clerk is directed to forward a copy of this Memorandum Opinion and the accompanying Order to all counsel of record.

**ENTERED** this 7th day of October, 2021.

                              */s/ Thomas T. Cullen*
                              HON. THOMAS T. CULLEN
                              UNITED STATES DISTRICT JUDGE